THE NEW YORK STATE MONITOR MILK PAN COMPANY (LIMITED), RESPONDENT, v. PHILO REMINGTON AND OTHERS, APPELLANTS.

*Agreement to manufacture and deliver articles subject to inspection by vendee — when the latter is bound by the acceptance of articles by his inspector — when the fact that the inspector did not know of the test by which the defect could be discovered will not relieve the vendee — measure of damages when one only of several separable parts of the article is defective.*

This action was brought to recover damages for a breach of a written contract, dated November 26, 1875, whereby the defendants agreed "to make for the party of the second part (the plaintiff), at the works of the said party of the first part (the defendants), at said Ilion, in a good, workmanlike manner, two hundred sets of milk coolers, patented June 29, 1875, and the right to manufacture which in the State of New York now belongs to the party of the second part (the plaintiff), to consist of four coolers or pans complete to each set. * * * Each ten sets subject to the inspection of the party of second part within five days after notice of completion. * * * Payment to be made one-half cash, on inspection, and the remainder at the expiration of four months."

The sets were all made, inspected by an agent selected and appointed by the plaintiff, accepted and paid for. Thereafter it was found that the enameling of two hundred and fifty-three pans of the sets last made and known as the Crowley pans would not resist the action of the lactic acid contained in milk, and that

the pans were, for the purpose for which they were made, worthless. Each cooler consisted of a pan for milk, a vat for water, and a frame for supporting the pan and vat. The pans cost about fifty-five per cent of the whole price, and when worthless could be replaced by a proper one.

It appeared that an inspector was appointed by the plaintiff, who examined, inspected and approved or rejected the coolers, and the evidence showed that he might, by the use of lactic acid, have readily determined the character and quality of the enamel at the time he inspected the article, and might by proper tests and examinations have discovered the defects complained of.

*Held*, that as an agent, selected by the plaintiff, pursuant to an express provision of the agreement, for the express purpose of making suitable and proper inspection, had examined and approved the pans, and as the defect complained of might have been discovered by the application of the proper tests, the damages arising from his negligence, inattention or want of capacity should fall upon the plaintiff and not upon the defendant. (HARDIN, P. J., and CHURCHILL, J.)

That the fact that the referee found that the test by lactic acid was not known at the time of the inspection to either party, and was not then in practical use, and that there was no evidence that it was then known except to scientists, did not relieve the plaintiff from liability for the omission of its agent to employ it. (FOLLETT, J., dissenting.)

The referee found that the pan, as made, had no market value, and that the defendants had given no evidence tending to establish that it had any, and awarded as damages the price of the whole cooler, including the pan, vat and frame.

*Held*, that this was error; that the fact that the pans were so defective as to be of no value, did not entitle the plaintiff to recover as damages the money which he had paid for the other parts of the coolers. (FOLLETT, J., dissenting.)

APPEAL from a judgment, entered in Delaware county on the report of a referee, for $7,694.62 damages and $917.10 costs.

The action was brought to recover damages upon a written contract, dated the 26th day of November, 1875, wherein the defendants contracted with the plaintiff and agreed to " make for the party of the second part (the plaintiff), at the works of the said party of the first part (the defendant) at said Ilion, in a good, workmanlike manner, two hundred sets of milk coolers, patented June 29, 1875, and the right to manufacture, which in the State of New York now belongs to the party of the second part, to consist of four coolers or pans complete to each set." The articles to be manufactured are particularly described in the contract. The contract also provided, viz. : " Each ten sets subject to inspection of the party of the second part within five days after notice of completion, * * * payment

to be made one-half cash on inspection, the remainder at expiration of four months."    *    *    *

The articles were manufactured according to the contract and delivered to the plaintiff, and by its agent for that purpose duly appointed and selected, accepted and settlements had and payments made therefor.    The plaintiffs allege that the pans were defective in that they were not properly and sufficiently enameled, and that the enamel was not so placed upon them as to remain hard and durable and to resist the action of the acid of the milk stored and held in the pans.    Of the pans two hundred and fifty-three were found by the referee to be defective.    It appears by the supplementary report of the referee correcting his first report " that such defective milk pans could be used for some purposes foreign to that for which they were made."    The referee also found " that the milk coolers contracted to be delivered under such contract would, on the 2d day of December, 1876, have been worth the sum of five thousand two hundred and thirty-nine dollars and nineteen cents."    He also found " that the actual damage that the plaintiff sustained on account of such defective pans was five thousand two hundred and thirty-nine dollars."    He also found that such damages " did include the cost of the vats, legs and braces, as well as the pans, as amongst the elements of damage."    The referee found as a matter of law, viz.:    " That there is no express warranty between the parties, except as contained in the agreement of November, 1875."

*Francis Kernan* and *Thomas Richardson*, for the appellants.

*W. H. Johnson*, for the respondent.

HARDIN, P. J.:·

In *Cary* v. *Gruman* (4 Hill, 625) it was held that " a warranty on the sale of a chattel is in legal effect a promise that the subject of sale corresponds with the warranty in title, soundness or other quality to which it relates.    *    *    *    It naturally follows that if the subject prove defective within the meaning of the warranty the stipulation can be satisfied in no other way than by making it good. That cannot be done except by paying to the vendee such sum as together with the cash value of the defective article shall amount to what it would have been worth if the defect had not existed."

That case was approved and followed in *Muller* v. *Eno* (14 N. Y., 605), where Judge COMSTOCK said that, in accordance with the doctrine of *Cary* v. *Gruman,* " the rule of compensation is now well settled, and this compensation, it should be added, is due immediately. I mean it is due immediately where the warranty relates to the soundness or quality of the article sold.    The promise is not one of indemnity against loss on a resale of the thing warranted by the purchaser.    The promise is broken as soon as made, although the defect may not then be known, and its effect is to subject the vendor at once to a legal liability to make good in money the difference between the article as sound and its actual value.    This liability stands upon the same footing as any other pecuniary obligation or debt."

Again, at page 206 of 14 New York, Judge COMSTOCK says: " It has been already stated the measure of damages on a breach of warranty in the sale of goods is the difference between the value of the goods if they had corresponded with the warranty and their actual value.    This rule rests upon a sound principle and it must be regarded as settled by the two carefully considered cases of *Voorhees* v. *Earl* (2 Hill, 288); and *Cary* v. *Gruman* (4 id., 625)."    To the same effect is *Comstock* v. *Hutchinson* (10 Barb., 211).    To the same effect also is *Richardson* v. *Mason* (53 Barb., 601).    To the same effect is *Milburn* v. *Belloni* (34 Barb., 607), where the warranty was that the coal dust was free from soft coal, and that it was fit for use in making brick, and it was held that the recovery should have been " the difference between the value of the article sold him (plaintiff) as it was, and its value as it would have been if it had been such as it was represented " to be.

In *Brigg* v. *Hilton* (99 N. Y., 519) the rule was laid down to be " the difference between the value of the goods if they had been as warranted, and the actual value of the goods in their defective condition."

It appears by the testimony of Ross, the superintendent of the defendants, that none of the parts of the coolers were enameled except the pans, and no complaint was made of any of the parts of the coolers except as to the pans, and the defect complained of in respect to the pans was confined to the quality of the enamel on the pans.    The witness added " the proportion of cost, that is the

proportion of price which we received for the manufacture of this whole complete arrangement, including a pan with its enamel, a vat and its legs and braces, would be fifty-five per cent for the pan and enamel, and about forty-five for the balance; that is, fifty-five for the pan with its enamel, and forty-five for the vat, legs and braces."

The witness further added, viz.: "Assuming that the enamel is soft and that the pans are useless for the purpose for which they were manufactured, the pan only, assuming that they were too soft for the purpose of holding milk, yet they are not entirely valueless for other purposes. They might be used for water vats. We have used some of them for that purpose. In other words, where the element of lactic acid does not come into consideration, and its effect upon the enamel, these pans would be as serviceable with the enamel they have on them as any other enamel so far as I know. So far as we have used them they answer the purpose."

Plaintiff's witness, Wright, who had negotiations leading up to the contract in behalf of the plaintiff, testified: "If the pan was properly enameled it would make it good; I don't know that I ever called on the defendants to furnish other pans in case of defective enameling; if from any cause a pan was worthless, another pan could be placed in that set; a proper pan would remedy the defect."

It appears by the referee's opinion that he took the price paid for the coolers, including all of their four several parts, "as the market value of the articles contracted for, and that he reached the conclusion" that the pans, as made, had no market value; and he also said in his opinion that the defendants had "given no evidence tending to establish the same," that is, the market value of the pan as a separate and independent article.

It appears from his report, as well as from his opinion, that he has allowed the plaintiff to recover the whole price paid for the combined article called the coolers, embracing the four separate parts. If it be assumed upon the evidence that the plaintiff had satisfactorily shown that the pans were so defective as to be of no value, and that, therefore, the plaintiff might have a recovery of a sum equal to the price paid for the pans, it does not follow that because the pans were defective to such an extent as to be of no value, except, perhaps, for old iron, or for vats to hold other liquids,

that the plaintiff was entitled to recover as damages that sum of money which it had paid for the other three parts of the cooler. It would seem, therefore, that the referee has fallen into an error in respect to the rule of damages.

*Second.* The written contract entered into by the parties provided for the inspection of the manufactured articles by the plaintiff. In pursuance of that contract it designated a party to inspect the manufactured articles. Defendants allowed him ample opportunity to make such inspection. He visited the works of the defendant and from time to time examined, inspected, approved, rejected or accepted the manufactured articles as in the exercise of his discretion and judgment he deemed proper.

According to the evidence, in many instances, articles were rejected or disapproved of until remedied, and in some instances the rejection was entire. It is not pretended, in any aspect of the case, that there was any fraud or collusion practiced in respect to the inspection, examination or acceptance of the manufactured articles. It is manifest from the evidence taken upon the trial that the inspector, by the use of lactic acid, could readily have determined the character and quality of the enamel at the time he inspected the manufactured articles. It is inferable that had he made the proper tests and examinations, and carried his inspection to the extent that the spirit of the contract warranted, he would have discovered the existence of the defects that are complained of in respect to the enamel. Upon a discovery of that defect and a rejection, the process of manufacturing in that regard would have been arrested, or the defect remedied.

In the contract between the parties, as well as in the evidence in respect to their execution of it in the selection of an inspector, it appears that the plaintiff had it in its power, and it was its privilege to make the selection of any person it might choose, to examine the manufactured articles and exercise the power of inspection given to the plaintiff in the contract.

The language of DAVIS, P. J., in *McParlin* v. *Boynton* (8 Hun, 453), is pertinent at this point. He there said of a party situated in respect to the right of inspection, as were the plaintiffs in the case now before us, that he " had the privilege of selecting any person he chose. It was both his interest and duty to select an

entirely competent and skillful man. If he failed to do that it was his misfortune or neglect. There can be no doubt that the defendant was not bound to take any of the saws rejected by the person he employed for not coming up to the requirements of the contract in any respect. It is more than probable that the defendant selected an incompetent man, but as all the saws, as they were made, were delivered into his hands, and passed upon by him, and subsequently delivered to the defendant, no remedy remained for lack of compliance with the contract, unless on some ground of fraud which is not alleged."

It is also said in the opinion from which we have quoted that it is within the power of parties to make such an arrangement for an inspection, as we find in the one before us, and the learned judge adds : " Where parties stipulate that articles to be manufactured shall be of a particular kind and quality, and at the same time stipulate that they shall be tested by some person selected by the purchaser, before delivery, to ascertain whether they are of a specified kind and quality, and such test is in fact made by him, and the goods are thereupon delivered and accepted, no remedy by action can be had, upon the contract, although the goods, or some portion of them, are subsequently ascertained not to be equal to the warranty. In the absence of fraud and of collusion between the manufacturer and the person selected, his decision, upon the test that the articles are such as the contract requires, is conclusive against the purchaser who subsequently receives them."

It appears the case, from which the above quotation is made, was taken to the Court of Appeals and the judgment affirmed (71 N. Y., 604), the affirmance receiving four affirmative votes. Under such circumstances it seems to be the duty of this court to accept the doctrine of *McParlin* v. *Boynton*, as laid down by the General Term of the First Department, in the opinion of DAVIS, P. J., from which quotations have been made.

*Brigg* v. *Hilton* (99 N. Y., 520) lays down the principle which enables a vendee who has received goods under a warranty, notwithstanding he has retained them and used them, to recover for damages arising out of the breach of warranty. In that case the goods were represented as sound and merchantable goods, represented for and " known as cloakings," and which the plaintiffs agreed " should

in all respects be equal to the samples," and it was alleged that the vendee, "relying upon the plaintiff's agreement and guaranty, accepted and paid," and that he subsequently discovered that none of the goods " corresponded with the samples, but were imperfect, unmerchantable," etc. In that case there was no express stipulation for an inspection by a party to be named by the vendee, nor in fact was there an inspection in pursuance of the tenor and spirit of the contract.

Here the parties carefully provided for the mode and manner of ascertaining the character and quality of the articles offered to and delivered to plaintiffs under the contract. The undertaking of the defendants, found in the contract, was to make for the plaintiff, at the works of the defendant at Ilion, " in a good, workmanlike manner," the coolers named in the contract, which were to be shipped as the plaintiff should direct, and it was provided that the articles so manufactured were to be in sets of ten " subject to the inspection of the party of the second part, within five days after the notice of completion ; " and it was further provided in the contract, viz. : " Payments to be made one-half cash on inspection, and remainder at expiration of four months, with interest for two months."

By the acts of the parties in the execution of the contract, it is evident they understood, and, therefore, so proceeded in the execution of the contract, that it was the duty of the plaintiff, on receiving notice or request, to select and furnish an inspector. It did select and furnish such inspector in accordance with such understanding of the contract, and in accordance with its terms.

The referee found, as a fact, that plaintiff paid for the articles manufactured before the defect in the enamel was discovered. He also found, viz. : " Such defect was latent and was not ascertained or ascertainable by any process that could be reasonably employed, until the pans had been used for some weeks for storing milk. It is not easy to approve of the finding that the defect was not ascertainable " by any process that could be reasonably employed until the pans had been used for some weeks for storing milk."

It may be that the parties to this action, and certain witnesses that were called to the stand in the progress of the trial, did not understand the chemical effects of lactic acid, or understand the

proper and correct mode of ascertaining the character and sufficiency of enamel when placed upon articles of the kind referred to in the contract. But it by no means follows that it was not the duty of the plaintiff to select a competent, capable person to sufficiently and suitably inspect the goods which they were to accept upon the inspection being made in their behalf, and for which they had expressly stipulated to pay " on inspection."

The referee found, as a matter of fact, " that the quality and fitness of the enamel was ascertainable by applying lactic acid." It was the neglect of the plaintiff that that test was not made. It had the opportunity to select a party capable of making such a test. If it failed to make the proper selection, that failure was because of its inattention to its privileges and rights. That neglect may not be .excused by the findings of the referee, to the effect that that test .'' was not known by either party," nor by the finding that " there is no evidence that it was known except to scientists," nor by the finding that the test was not in practical use.

Diligence on the part of the plaintiff in ascertaining the proper test for the durability of the enamel, doubtless would have revealed the fact to " scientists," or other persons familiar with the nature and character of the component parts of milk, or its action upon .substances when kept for a long period of time in contact with them, and that such action was the same in effect as is produced upon substances by bringing them in contact with lactic acid, one of the properties of milk. To test the enameling does not necessarily involve its use for a long period of time.

In *Gautier* v. *Douglass Manufacturing Company* (13 Hun, 524) it was admitted that the quality of the steel could not be ascertained without working it up, and " that an inspection and examination of it would not reveal its defects." At page 525, the judge who delivered the opinion in that case said, viz. : " The test of the steel involved its use and it could not be rejected or returned." That case is, therefore, unlike the one before us.

In *Gurney* v. *Atlantic and Great Western Railway Company* (58 N. Y., 358) it was held that " if a defect exists which could not be determined by examination upon the receipt of the articles, but only upon use, it is not the duty of the vendee to rescind the contract and return or offer to return the property upon discovery,

but he may retain them and recover or recoup his damages." In that case the referee found the frogs " were defective and brittle, but that this could not be discovered by examination, and could only be ascertained by use, and that the failure of one created no presumption that others were defective," and in that case CHURCH, Ch. J., said, viz. : " The general rule is, when articles are sold upon an executory contract like the one in question, that the delivery and acceptance of the articles after examination, or an opportunity to examine them, is a consent or agreement that the articles correspond with the contract, and precludes a recovery for any defects which may exist."    (53 N. Y., 515.)

It was further observed by the court, viz. : " The vendee must have an opportunity to examine, and when, from the terms of the contract or the nature of the article this can only be done by use, and such was, therefore, the mode of examination contemplated, the vendee is not foreclosed until the test is made.    But when made and the defects discovered, is it not the duty of the vendee then to take his ground and rescind the contract and return or offer to return the property, or be held to a waiver and acceptance ?    Upon principle I can see no difference in this respect on account of the time or mode of examination."

It would seem that the case from which the quotation has just been made warrants the conclusion that when the contract in terms prescribes an examination or inspection or a test, and an opportunity has been afforded for the exercise of that option and privilege on the part of the vendee to examine, inspect and test, and it has been exercised, and it appears there has been no fraud or collusion in the test, examination or inspection contemplated by the contract between the parties, it is to be deemed final and binding upon them. In the case in hand the plaintiff's agent, by it selected for the express purpose of making suitable and proper inspection, examined all the pans and the enameling thereof, and approved of the same.    If he was incompetent, if he was negligent, if he was inattentive, the responsibility for such neglect, inattention or want of capacity, according to *McParlin* v. *Boynton* (*supra*), should fall upon the plaintiff.

The foregoing views, together with those expressed in the opinion of CHURCHILL, J., lead me to concur in the result reached by him in

his opinion, in favor of a reversal and a new trial before another referee, with costs to abide the event.

CHURCHILL, J. :

By the written contract of the parties the defendants were to make for the plaintiff, at the works of the former in Ilion, "in a good, workmanlike manner, two hundred sets of 'milk coolers,' patented June 25, 1875, to consist of four coolers or pans complete to each set." The plaintiff was assignee of the patent for the State of New York and had the exclusive right to manufacture the coolers within the State. The contract further provided that each ten sets should be subject to the inspection of the plaintiff within five days after notice of completion, and that payment should be made one-half cash, on inspection, and the remainder at the expiration of four months, with interest after two months. The sets were all made, inspected, accepted and paid for. Subsequently it was discovered that the enameling of two hundred and fifty-three pans of the sets last made and known as the Crowley pans would not resist the action of the acid of milk, and that the pans for that reason were worthless. The pans were separate from the other parts of the coolers and cost about fifty-five per cent of the whole expense, and when the pan was worthless, supplying a proper pan would remedy the defect.

The fact that the enameling of the defective pans would not resist the action of the milk was not discoverable by ordinary inspection, but could have been discovered by testing with milk if continued for a sufficient length of time, or by the use of lactic acid. No offer to return the defective sets was made by the plaintiff, and they yet remain in its possession. The referee gave as damages the entire price paid by the plaintiff for the defective sets. The words " in a good, workmanlike manner " are not surplusage and do not import into the contract an obligation which the law would imply without them. Taken in connection with the specifications accompanying the letters patent, the defendants thereby agreed to enamel the iron pans forming part of each set in such manner as " to protect the iron from the effect of the acids contained in the milk or cream when sour." The Crowley pans were defective in this respect for which the plaintiff is entitled to damages unless the provision with respect to inspection prevents.

If it be true, as found by the referee, that the inspection made was not conclusive except as to patent defects and such as were discoverable by observation, and that the plaintiff was in no wise concluded by such inspection and subsequent acceptance as to latent defects, the provision for such inspection was surplusage, since such defects would have been waived by acceptance without any provision therefor in the agreement. This provision for inspection should be construed to mean something equally with the words " in a good, workmanlike manner." If not limited to patent defects it must extend to and include latent defects, and in the absence of collusion or fraud bar any recovery therefor. (*McParlin* v. *Boynton*, 8 Hun, 449; affirmed, 71 N. Y., 604; *Wyckoff* v. *Meyers*, 44 id., 143.)

*Glacius* v. *Black* (50 N. Y., 145) distinguishes *Wyckoff* v. *Meyers* as a case where *payment* was to be made upon the certificate of the architect. But in the present case payment was to be made " on inspection."

The pans were worthless to store milk unless enameled in such manner as to protect the iron of the pan from the effect of the acids of milk and cream when sour. The specifications forming part of the letters patent, of which the plaintiff was an assignee, showed this fact and also stated that the manner of preparing and applying the enamel was well-known to those skilled in the art. The defendants had a right to presume that the plaintiff had tests by which they could determine whether or not the pans were fit for the purpose for which they were made, and that the inspection provided for by the contract would at least extend to and determine whether or not in this essential particular they were of the kind required by the contract. The inspection by plaintiff's agents of the pans complained of and their subsequent acceptance are a bar to any recovery in this action.

An improper rule of damages was adopted by the referee. The only part of the " milk cooler" which was defective was the pan, which cost about fifty-five per cent of the whole. " If from any cause a pan was worthless, another pan could be placed in that set; a proper pan would remedy the defect."

From this it would seem that by an expenditure of a little more than half the original cost of manufacture, the plaintiff could make

perfect the articles complained of. This being so, an award of the entire cost as damages was unauthorized.

The judgment should be reversed and a new trial ordered before another referee, costs to abide event.

FOLLETT, J. (dissenting) :

The plaintiff owns the exclusive right to sell within the State of New York "Johnson's milk cooler," a patented utensil for the use of manufacturers of butter or cheese. Each cooler consists of (1) a pan for milk ; (2) a vat for water; (3) a frame supporting the pan and vat. The pan is made of cast-iron, enameled on the inside and used for storing milk until the cream rises to the surface and is removed. The vat is made of cast-iron, encases the pan and is used for storing water, so as to keep the milk at a proper temperature. The frame is made of cast-iron and supports the pan and vat. Four of these utensils are called a set — a set consisting of four pans, four vats and four frames. The defendants are manufacturers of agricultural implements at Ilion, New York. November 26, 1875, the parties to this action entered into a written contract, by which the defendants, for a sum agreed upon, contracted to furnish the material and manufacture, in a good, workmanlike manner, 200 sets of milk coolers with enameled pans, and deliver them to plaintiff at Ilion, New York. Each ten sets subject to inspection by plaintiff within five days after notice of completion. Under this contract defendants manufactured and delivered to the plaintiff 136¾ sets of coolers, with 547 enameled pans, which were accepted by the plaintiff and pronounced satisfactory, except as to some slight imperfections in the surface of the enamel, called " pinholes," which did not impair the practical usefulness of the pan. The pans above-mentioned were enameled by Joseph Parks, and are known as the " Parks pans," over which no question is raised in this action.

Afterwards, the defendants manufactured and delivered to the plaintiff sixty-three and one-quarter sets of coolers, with 253 enameled pans, for which the plaintiff paid $5,239.19. These pans were enameled by Job B. Crowley, and are known as the " Crowley pans." After the Crowley pans had been in use for a short time, the enamel was softened by the fermentation of milk and proved

worthless for the purpose for which they were made.    This action was brought to recover damages occasioned by this defect.    When milk sours or ferments, lactic acid is developed.    So far as it is disclosed by the evidence, enameled cast-iron receptacles for milk undergoing fermentation were never used prior to the invention and use of this milk cooler; or, if used, the use was so limited that the action of lactic acid upon enamel laid on cast-iron had never been observed, at least, so far as was known to the parties to this action.    The referee found that the 253 pans were not manufactured " in a good, workmanlike manner," as stipulated in the contract.    It is unnecessary to consider whether the stipulation to manufacture, " in a good, workmanlike manner," is technically a warranty, or simply an executory promise; for, if broken, the defendants are liable unless the plaintiff is estopped from claiming damages by inspecting, receiving and retaining the coolers.

The first question is, whether the above finding of fact is sustained by the evidence ?    Farmers who used the pans enameled by Crowley testified that after a few weeks use the enamel softened, became rough and the pans were thereby rendered worthless for dairying purposes.    Anable, one of defendants' employees, who was sworn in their behalf, testified that he tested, with lactic acid, the pans enameled by Crowley, and that under the test the enamel softened, became rough and could be scraped off; that the enamel was defective, and by reason of the defect that the pans were worthless for dairying purposes, was not disputed on the trial.

Was this defect the result of unskillful workmanship ?    It is alleged in the complaint that the pans enameled by Parks resisted the action of lactic acid and served the purpose for which they were designed.    This allegation is admitted in the answer.    Van Dyke used pans enameled by Parks in his dairy eight years, and they resisted the action of lactic acid.    Young used pans enameled by Parks in his dairy four years, and they stood the test.    Anable, defendants' employee, testified that under the direction of defendants' superintendent, he tested, with lactic acid, pans enameled by Parks and pans enameled by Crowley, and that the pans enameled by Parks stood the test, but those enameled by Crowley did not.    This evidence seems to establish the fact that there were no insuperable difficulties preventing the production of enameled pans which

would serve the purpose for which they were designed. Crowley testified that he informed Ross, defendants' superintendent, that the furnace in which the enamel was hardened, or fused upon the pans, was defective, and asked for a different one. Ross denied this, and testified that Crowley asked that changes be made in the furnace, and that it was changed as desired. Anable testified that soon after Crowley commenced work, Parks said that Crowley's enamel " would not stand, being too soft." Gibson, one of defendants' workmen employed on these pans, testified that Parks told him that Crowley's enameling would not stand. Both testified that they told Center, plaintiff's general agent, what Parks had said, and that he replied he would risk Crowley's work. Center denies this. At folio 76 of the answer it is alleged that defendants' agents doubted the ability of the pans enameled by Crowley to resist the action of lactic acid, and that they communicated their doubt to the plaintiff's agent. If it be true that defendants' agents did not communicate to plaintiff's agent Parks' statement, and if it be true that Crowley informed defendants' superintendent that the furnace was unfit for the purpose, it goes far towards charging defendants with a negligent non-performance of their contract. Whether Crowley was employed upon the request or recommendation of plaintiff's agents, was a disputed question. The credibility of these witnesses was for the referee, and, assuming that the plaintiff's witnesses testified truthfully, the defect was the result of unskillful workmanship and the finding of the referee cannot be set aside as contrary to the evidence.

It is urged that the plaintiff cannot recover because it inspected, accepted and retained the coolers without offering to return them. If a manufacturer, having agreed to make and subsequently deliver in a good and workmanlike manner articles designed for a known use, delivers articles not so manufactured, which are unfit for the use, the vendee may retain the articles and recover the damages. (*Brigg* v. *Hilton,* 11 Daly, 335 ; affirmed, 99 N. Y., 517 ; *Hoe* v. *Sanborn,* 21 id., 553 ; S. C., 36 id.; 93 ; *Norris* v. *La Farge,* 3 E. D. Smith, 375.) Apart from the provision in the contract in respect to the inspection, the retention of the coolers, after discovering the defect, would not bar the plaintiff's claim for damages. The contract provides : " Each ten sets subject to the inspection of the party of the second part (plaintiff), within five days after notice of

completion." Under this provision the plaintiff inspected, accepted and paid for the pans enameled by Crowley.

It is conceded that when the pans enameled by Crowley were inspected and delivered, the parties to the contract knew of no test by which the durability of the enamel could be tested, and that the defect subsequently developed by actual use was a latent one. Anable, after describing the process of inspection, testified : " At that time I did not know that anything further could be done for the purpose of obtaining a better knowledge as to whether the pans would answer the purpose or not."

A manufacturer, under an agreement to manufacture in a good and workmanlike manner articles designed for a specific purpose, remains liable for latent defects arising from unskillful workmanship, notwithstanding the vendee's acceptance of the articles after inspection or trial, under a clause in the contract of sale giving the vendee the right to inspect or try. (*Bird* v. *Smith*, 12 Q. B., 786; *Heilbutt* v. *Hickson*, Law R., 7 C. P., 438; 2 Benj. Sales [Corbin's ed.], § 911, p. 792 and cases cited.) The effect of this clause was to pass the title of the accepted coolers to the plaintiff and the defendants became entitled to the purchase-price, subject to their continuing liability on their agreement to manufacture in a skillful manner. It will be observed that the contract does not contain an arbitration clause or a clause of that nature, nor does it provide that acceptance after inspection shall discharge the defendants' agreement to manufacture in a good, workmanlike manner.

Several cases have been cited as bearing upon this question. *Wyckoff* v. *Meyers* (44 N. Y., 143) arose over a building contract which contained an arbitration clause, naming arbitrators, and it was held that the certificate of the arbitrators was binding upon the parties. *Glacius* v. *Black* (50 N. Y., 145) also arose over a building contract, which provided : " That the materials to be furnished shall be of the best quality, and the workmanship performed in the best manner, subject to the acceptance or rejection of Edward Wall, architect, and all to be in strict accordance with the plans and specifications which are signed by the parties of the second part, and form part of this contract." The builders procured the certificate of the architect and sued for the contract-price, and it was held that defendant might recoup his damages arising from a failure

to do the work in a workmanlike manner. This case was distinguished from *Wyckoff* v. *Meyers*, because of the absence of an arbitration clause. *Bird* v. *Smith* (*supra*) was cited with approval. *McParlin* v. *Boynton* (8 Hun, 449) arose over a contract to manufacture and deliver saws of a stipulated quality, subject to the inspection of the vendee. The saws were inspected and accepted, but were subsequently found not to be of the quality warranted. In an action for the price it was held that the defendants could not recoup their damages, upon the ground that the defects were of a character that might have been discovered by inspection. None of the cases above cited are referred to in the opinion. This judgment was affirmed (71 N. Y., 604) without an opinion, three of the judges dissenting. *Bigler* v. *Mayor* (9 Hun, 253) arose over a contract to furnish lumber and timber of a specified quality and size, " subject to the inspection of the superintendent of repairs and supplies of the department of docks." The plaintiff held the certificate of the superintendent, and upon the trial of an action for the purchase-price, the court held the certificate conclusive upon the defendant, unless the jury found that it was fraudulently given or obtained. This was held to be error and a new trial was granted, the court holding that the certificate was not conclusive, as the contract did not so provide. In this case *Bird* v. *Smith* (*supra*) and *Glacius* v. *Black* (*supra*) were commented upon and approved, and *Wyckoff* v. *Meyers* (*supra*) was distinguished, but *McParlin* v. *Boynton* (*supra*), decided by the same court at the preceding term, was not cited. The construction given to the clause under consideration seems to accord, in principle, with the rule declared in *Brigg* v. *Hilton* (*supra*), as it is difficult to see why a liability survives the acceptance and use of defective articles with an ample opportunity to inspect under an executory agreement to deliver articles of a prescribed excellence, and not survive inspection and acceptance under a like agreement containing a clause simply giving a right to inspect, which right the vendee has without the clause. (*Pope* v. *Allis*, 115 U. S., 363.)

The measure of damages is the difference in value between coolers manufactured in a good and workmanlike manner and those delivered. Plaintiff's witnesses testified that the defective coolers delivered would have been worth the price paid, $5,239.19, had

they been manufactured in a good and workmanlike manner, which evidence is undisputed. The plaintiff's witnesses also testified that the defective coolers were worthless. The burden was then upon the defendant to show that the coolers were of some value. Defendants' superintendent testified that the coolers "were not entirely valueless for other purposes;" that defendants used some of them for sinks and the remainder of the rejected pans were broken up as old iron, for which purpose they were worth about a penny a pound, and that he told plaintiff's agent that they were good for nothing else. Assuming that the defendants were liable, the damages were not excessive, and the correct measure of damagas was adopted. None of the rulings of the referee upon the admissibility of evidence being questioned upon the argument, they are not considered.

The judgment should be affirmed, with costs.

Judgment reversed and a new trial ordered before another referee, with costs to abide the event.