SAMUEL GURNEY et al. *v.* THE ATLANTIC AND GREAT WESTERN RAILWAY COMPANY et al.

An executory contract to manufacture and deliver articles, corresponding in all respects to a sample shown, binds the party to furnish articles equal to the sample in manufacture, material, description, quality, fitness and durability, for the use for which they were designed.

If a defect exists which could not be determined by examination upon receipt of the articles, but only upon use, it is not the duty of the vendee to rescind the contract, and return or offer to return the property upon discovery; but he may retain them and recover or recoup his damages. (GROVER, J., dissenting.)

The term "employe" in its ordinary and usual sense includes all whose services are rendered for another; it is not restricted to any kind of employment or service, but includes as well the professional man as the common laborer.

An order appointing a receiver of a railroad company directed him, among other things, to pay debts " owing to the laborers and emyloyes " of the company "for labor and services actually done in connection with that company's railways." *Held,* that it included a claim of counsel for professional services rendered by him on employment of the company in litigations relating to the railway, its interests and business. (GROVER, ANDREWS and JOHNSON, JJ., dissenting.)

*Ericsson* v. *Brown* (38 Barb., 390), *Aikin* v. *Wasson* (24 N. Y., 482),

*Coffin* v. *Reynolds* (37 id., 640) distinguished; *Gurney* v. *A. and G. W. R. Co.* (2 N. Y. S. C. R. [T. & C.], 446) reversed.

(Argued June 9, 1874; decided September 29, 1874.)

THERE were two appeals in this matter, one by Robert Hitchcock, receiver of the Atlantic and Great Western Railway Company, and one by Jeremiah S. Black, from an order of the General Term of the Supreme Court in the fourth judicial department, affirming an order of Special Term in reference to payments from a fund in the hands of Robert B. Potter, receiver. (Reported below, 2 N. Y. S. C. R. [T. & C.], 446.)

In 1867, this suit was pending in the Supreme Court to foreclose a mortgage executed by the Atlantic and Great Western Railway Company. On the 27th day of March, 1867, Robert B. Potter was appointed receiver of the railroad, and was directed out of the receipts from the road to pay "the expenses of maintaining and operating the said railways and mortgaged property and premises, including the purchase of all such supplies and materials, and of such renewals and repairs as may be required for carrying on the same." After deducting these and some other items, he was directed out of the balance of earnings in his hands, being net earnings, to pay and discharge:

First. Arrearages owing to the laborers and employes of the said consolidated corporation defendants, for labor and services actually done in connection with that company's railways, and amounts due connecting roads.

"Such sums as may remain actually due for materials and supplies furnished said consolidated company defendants, for the use of its railways."

The receiver went on and managed the road, and received and disbursed from time to time large sums of money. The railway company finally made arrangements for resuming possession of their road, and it being found impracticable before resuming such possession to actually pay and discharge all the amounts which the receiver had been directed by the order of March 27, 1867, to pay, the said company paid him

$1,218,750 to cover such liabilities, and resumed possession of the road.

Out of this sum the receiver made a large number of payments of claims which he admitted, and he then petitioned the court for his discharge and for an order referring all the disputed claims to a referee for his decision. This order was granted April 30, 1870.

Among these disputed claims was a claim of Naylor & Co., for steel frogs furnished to the company and to the receiver, for $6,886, gold, and $92.46, currency ; and a claim of Jeremiah S. Black for professional services as counsel for the railroad company, rendered prior to the appointment of the receiver, $5,000.

In reference to the claim of Naylor & Co. the referee found as follows :

"Prior to the appointment of the receiver the Atlantic and Great Western Railway Company ordered of Messrs. Naylor & Co. 200 reversible steel frogs to correspond, in all respects, with a certain steel frog it had theretofore received and was then using (and which proved to be a good and serviceable article), except in the matter of the length of the frogs, which was to vary slightly from the sample. Naylor & Co. sent an order to Vickers & Co., of England, to manufacture the frogs according to the said pattern, that firm having manufactured the frog already in use.

"Seventy-five of the frogs were furnished to the company, upon its orders, between the 1st day of August, 1866, and the 1st day of January, 1869. Twenty-two of the said frogs were delivered to the receiver on or shortly after the 27th day of May, 1867.

"Naylor & Co. presented bills for said frogs to the receiver in their own names as vendors.

"Most of the frogs, except the sample frog, were found to be brittle, and they did, in fact, break within a short period after being placed upon the road. They were then of no value for the purpose for which they were ordered.

"After being broken the railway company, without offering

to return them, sold the broken pieces for old iron, and as such they were worth about a half of one cent per pound.

" There was nothing in the general appearance of the frogs before use, nor anything discoverable, from a particular examination of them, to show what was their real condition, which could only be tested by actual use. There was no presumption that because a single frog broke in using, the remainder would do so, and I hold that the company had a right, notwithstanding the fact that one or more frogs may have broken within a very short time after being laid down, to lay down and use the remainder, as being necessary in their business.

"Although Messrs. Naylor & Co. have no claim on the receiver under the original contract for the frogs delivered, yet, as against the railway company, they may under the provisions of the order appointing the receiver, and the conclusions I have arrived at in respect to the ultimate ownership of this fund be entitled to recover the real value of the ninety-seven frogs delivered respectively.

" The proof as to this value is not full. It appears that sixty-three of the frogs were defective and broke early, and of the remainder twenty-one continued in service; and it does not appear that the other thirteen were laid down or further accounted for.

" I have prepared from the schedules in proof, and return herewith, a statement showing the average duration of the defective frogs and what their use was worth, as compared with the sample frogs, even assuming for those a duration of only seven years.

"According to that statement the amount Messrs. Naylor & Co. would be entitled to would be $2,410.54 in gold and $450.34 in currency."

In reference to the claim of Mr. Black, he found the claim to be reasonable in amount and due from the company, but that he was not included in the class provided for in the order ; that the word " employe " as there used only included those persons who had been in the stated and regular employment of the company. Naylor & Co. and Mr. Black excepted

to such findings. Upon the coming in of the report the Special Term allowed the whole of the claim of Naylor & Co. and directed the same to be paid in full. The report as to the claim of Mr. Black was sustained and the same was disallowed. Reuben Hitchcock, who had been appointed receiver of said railway company in a subsequent foreclosure suit and who was entitled to the surplus, appealed from so much of the Special Term order as allowed the whole of the claim of Naylor & Co., and Mr. Black appealed from that part disallowing his claim.

Further facts appear in the decision.

*Clarkson N. Potter* for Hitchcock, receiver, appellant. Under an executory contract of sale with warranty, where defects are not discoverable upon examination, the vendor is not bound, upon discovery after use, to return or offer to return, but can recoup damages. (*Day* v. *Pool*, 52 N. Y., 416; Story on Sales, § 455, *a ; Parker* v. *Palmer*, 4 B. & A., 387; *Street* v. *Blay*, 2 id., 464.) A sale by sample imports a warranty of quality. (Benj. on Sales, 482, 483; *Russell* v. *Meolpulo*, 8 C. B. [N. S.], 362; *Gallagher* v. *Waring*, 9 Wend., 26; *Waring* v. *Mason*, 18 id., 425; *Moses* v. *Mead*, 1 Den., 386; *O. M. Society* v. *Lawrence*, 4 Cow., 440; *Hart* v. *Wright*, 17 Wend., 274; *Beerin* v. *Burnside*, 1 Seld., 95.) An executory contract of a thing to be manufactured for a special purpose imports a warranty that it is fit and suitable for the purpose. (Benj. on Sales, 488; *Brown* v. *Edgerton*, 2 M. & G., 279; *Jones* v. *Bright*, 5 Bing., 533; *Laing* v. *Fulgeon*, 4 Cowp., 169; 6 Taunt., 808; *Hoe* v. *Sanford*, 21 N. Y., 561; *Prentiss* v. *Dike*, 6 Duer, 223; 1 Pars. on Cont., 469; *Parks* v. *Morris Axe Co.*, 4 Lans., 104.)

*J. S. Black*, appellant, in person.

*Everett P. Wheeler* for Naylor & Co., respondents. Under an executory contract of articles "to be made" the retention of the article, after opportunity to ascertain defects, is an

admission of performance. (*Gaylord Co.* v. *Allen,* 53 N. Y., 515; *Beck* v. *Sheldon,* 48 id., 365; *Reed* v. *Randall,* 29 id., 358; *McCornish* v. *Sarson,* 45 id., 265; *Neaffie* v. *Hart,* 4 Lans., 4.) Whatever warranty there was here it was part of the original contract, not collateral to it. (*Gaylord Co.* v. *Allen,* 53 N. Y., 515.)

*Clarkson N. Potter* for Hitchcock, receiver, respondent, as against J. S. Black, appellant. The word "employe" in the order did not include appellant. (38 Barb., 390; 23 N. Y., 484; 37 id., 642; 48 id., 370.)

Church, Ch. J. The undertaking of Naylor & Co. extended, I think, to the quality of the article contracted for as well as the material and general description. The referee finds that the order for the frogs required that they should correspond *in all respects* with a sample theretofore delivered by Naylor & Co. to the railway company, except as to a slight change in the pattern agreed upon. The form of the transaction would seem to constitute Naylor & Co. agents to procure the manufacture of the frogs, but it has been assumed throughout that they were the principals, and intended to deal with the railway company as such. Regarding them in that light, by accepting the order, they became bound by its terms to procure and deliver to the railway company reversible frogs in all respects equal to the pattern. This includes equality in manufacture, material, description and quality, or fitness and durability for the use for which they were designed. It cannot be supposed that either party intended anything less. The referee finds, in substance, that they were not equal; that a large number of them were defective and brittle, but that this could not be discovered by examination and could only be ascertained by use, and that the failure of one created no presumption that others were defective. After they were manufactured in England, the frogs were ordered in four parcels, three by the company and one by the receiver, of about twenty-five each. Nearly all of them were put in

use from time to time, and many of them, it is claimed, on account of defects, failed. When they did fail, they were sold for scrap steel, and no notice of such defects was given to Naylor & Co., nor any offer made to return the frogs, or any of them.

The substance of the arrangement was that Naylor & Co. agreed to procure to be manufactured a quantity of frogs, to correspond with the pattern, and deliver the same to the railway company as desired; in other words, it was an executory contract for the manufacture and delivery of certain articles of personal property of a specified quality and description. It was not strictly a sale by sample. Such a sale contemplates that the goods are *in esse*, that the sample is taken from the bulk and that the latter is equal in quality to the sample. This is some times called an implied warranty (Story on Sales, § 375), but it is more properly an express warranty. It amounts to an affirmation that the specimen is a fair sample of the bulk of the commodity. (Id., § 376; 5 N. Y., 103.) The general rule is, when articles are sold upon an executory contract like the one in question, that the delivery and acceptance of the articles after examination, or an opportunity to examine them, is a consent or agreement that the articles correspond with the contract, and precludes a recovery for any defects which may exist. (53 N. Y., 515; 29 id., 358; 49 id., 321.) The vendee must immediately rescind the contract, and return or offer to return the goods. He cannot retain the property and afterward claim damages by action or recoupment for inferior quality. Such a transaction differs from a sale with warranty in that the stipulated quality is a part of the contract itself, and not collateral to it. In the latter case the vendee is not bound to return the property, but may retain it and sue upon the collateral agreement.

It is found that the defects could only be discovered by the use of the article. The vendee must have an opportunity to examine, and when, from the terms of the contract or the nature of the article, this can only be done by use, and such was therefore the mode of examination contemplated, the

vendee is not foreclosed until the test is made. But when made and the defects discovered, is it not the duty of the vendee then to take his ground and rescind the contract, and return or offer to return the property or be held to a waiver and acceptance? Upon principle, I can see no difference in this respect on account of the time or mode of examination. The agreement as to quality is as much a part of the contract of sale in the one case as in the other, and by retaining the article after discovering that it is not in accordance with the contract, the vendee should be deemed to consent to accept the inferior article, whether this discovery is made from inspection or use. But the case of *Day* v. *Pool* (52 N. Y., 416) holds a different doctrine. In that case there was an executory contract for the sale of rock candy syrup, "that would not crystallize, or the sugar fall down" in its use, and this court held that the vendee was not bound to rescind the contract or return or offer to return the syrup upon discovering that it did not come up to the terms of the contract, but might keep the article, and rely upon the so-called "warranty." Although there were some peculiar circumstances in that case, yet the principle enunciated in the opinion which received the assent of a majority of the court, applied to the facts of this case, must, I think, determine this question in favor of the right of the vendee to retain the property and recoup the damages; and if that principle is to be adhered to, it is useless to review the grounds upon which the decision was based. I cannot concur with the grounds upon which the Special Term decided in favor of allowing the full price of the frogs, that the agreement did not relate to quality, or that the warranty was implied within the meaning of that term when applied to the obligation to rescind the contract upon discovering the inferior quality of the article, and the ground upon which the General Term affirmed this decision is in principle in conflict with *Day* v. *Pool* (*supra*). If the railway company had the right to retain the property and recoup the damages, as there decided, it would follow that they could show that all the frogs, or a part of them, were defective.

Retaining the property was not a waiver of a right to compensation for defects in a single one of the articles delivered. That some were perfect would only lessen the amount of damages. If this is to be regarded, as it respects rescinding and returning the property, as a warranty upon a present sale of personal property, there is no force in the idea that the rights of the parties were changed, because only a part of the articles included in an order were defective, and therefore rejected, and the perfect ones continued in use. The question of a division of the contract does not arise. The only remaining question is, whether there was evidence to justify the finding of the referee, that the frogs in question were not equal to the pattern furnished, and in making the allowance of damages for defective frogs. We cannot say that there was no evidence to justify the conclusion of the referee upon these points, especially not if, as has been suggested, all the evidence given upon the special reference was not returned. The order of the General and Special Terms must be reversed and the report of the referee affirmed, with interest upon the amount reported due to Naylor & Co. from the date of the first report, the costs of the parties to be paid out of the fund.

The claim of Jeremiah S. Black depends upon the construction to be given to the language of the order appointing the receiver. The receiver was directed to pay out of the net earnings, among other things, debts " owing to the laborers and employes of the said consolidated corporation, defendants, for labor and service actually done in connection with that company's railways." The claimant's demand is for professional services as counsel in important litigations connected with the road. The referee finds the claim " to be reasonable in amount and due from the company." It is manifest that literally and lexically the claimant was an employe of the company : that is, he was employed by and rendered important service for them. So the service rendered was in a sense in connection with the company's railways, that is, the services related to the railway and its interests and business. But it is said that it was only those who had stated and regular

employment in running the railway, that were intended to be provided for, and we were referred to several cases in this State which are supposed to be decisive. In *Ericsson* v. *Brown* (38 Barb., 390) the charter of a mail steamship company made the stockholders liable for debts due and owing to " their laborers and operatives," and it was held that a consulting engineer was not included. So in *Aikin* v. *Wasson* (24 N. Y., 482) it was held that a contractor was not included within the words " laborers and servants," used in the general railroad act. In *Coffin* v. *Reynolds* (37 N. Y., 640) it was held that the secretary of a manufacturing corporation was not included in the general statute which made stockholders liable for debts owing to " their laborers, servants and apprentices." It will be observed, in the first place, that the word " employe," used in the order, is not found in any of the statutes involved in these cases. This is a word of more comprehensive signification than laborers and operatives, and that a contractor is in no proper sense a servant, but in many respects an independent party, and that a secretary is not a servant within the ordinary meaning of that word, but is an officer, recognized by law as such, seems manifest and plain enough. Yet, in 24 Barbour, 99, it was held that an officer was a servant if he had no distinctive appellation, and in 43 Barbour, 163, it was held that a secretary was a servant within the meaning of the statute, but this may be regarded as overruled by 37 New York (*supra*). Aside from the difference of words, there is, I think, a distinction between the above cases and this, in the rules of construction, which should be applied. In those cases there was a statute liability created against stockholders, and such statutes are always strictly construed. Again, the courts held that it was the policy of the legislature to protect those only who are the least able to protect themselves and who earn their living by manual labor for a small compensation, and not by professional services, and this supposed legislative policy exerted a controlling influence upon the courts. In this case it was entirely different. There was no question of policy. It was a scramble

for payment of debts against a defaulting corporation, and the terms of the order were fixed by negotiation and agreement between interested parties. The mortgage creditors were anxious for the appointment of a receiver. The common creditors, including the claimant, were interested in delaying it. It required the action of courts in three States which could not be obtained in several months, except by consent. The counsel for the plaintiff and other mortgage creditors testified that in order to facilitate the appointment of a receiver, he "was willing at that juncture to make concessions to the company, I might not have made at other times." These concessions were in favor of common creditors, like the claimant, who desired protection. They were agreed upon by a committee, one of whom had a claim similar to this. The counsel also testified that the word "employes" was not used in any particular or strict sense, but according to its general meaning, including attorney's compensation as well as others employed by the company. If this evidence is to be considered, there can be no question as to the meaning of the parties who agreed to the terms of this order, and that it was designed to include the debt of the claimant. Aside from this, it is not pretended that the claimant is absolutely excluded by the terms of the order. The decision rests upon the supposed intent. It is quite as rational to believe that the intent was to include as to exclude the debt of the claimant. Debts for materials and supplies were protected, and why may we not suppose that the claimant's demand was regarded to be as just and equitable as those, especially under the circumstances referred to? The mortgage creditors received what they regarded a great benefit by making these concessions, in the immediate appointment of a receiver, and the order should be liberally construed in favor of the creditors, who are presumed to have assented to them and relied upon them for the payment of their debts.

The order rejecting the claimant's demand must be reversed and an order entered allowing it, and directing its payment according to the terms of the order.

ALLEN, J. It is only necessary for me to consider the claim of Judge Black for professional services, disallowed by the referee and the Supreme Court.

It is conceded that the services constituting the claim were rendered to the railway company upon its employment; that the amount demanded is but a reasonable compensation for such services, and that the same is and was, at the time of the appointment of the receiver, justly due the claimant from the corporation.

The claim was rejected by the court below solely because it was thought not to be included in the class of debts and obligations provided for in the order appointing Mr. Robert B. Potter receiver, and authorized to be paid by him.

The receiver is directed, after the payment of certain expenses, to pay, out of the earnings of the railway of the defendant corporation, among other debts and claims, all arrearages " owing to laborers and employes of the said consolidated corporation defendants, for labor and service actually done in connection with that company's railways." The order was made upon the application and in the interest of the mortgage bondholders and creditors of the corporation, to whom and whose interests an early appointment of a receiver, and the actual possession of the property and the receipt of the earnings of the company, was important, and the provisions inserted for the payment of the general and unsecured debts of the company were the result of negotiations between the representatives of the secured mortgage creditors and the creditors at large, and of concessions by the former to the latter, to prevent opposition or induce a consent to the proceeding.

General creditors of the insolvent corporation, not provided for in the order appointing the receiver, were necessarily remediless in respect to their debts, as the entire assets and means of payment by the corporation were withdrawn from it and placed in other hands, to be administered for the benefit of lienors and those entitled, by reason of their securities, to priority of payment upon a sale or other dis-

position of the property.   The reason and purposes of the clauses directing the payment of certain of the general creditors, as well as the circumstances under which the order was made, forbid that a narrow, peculiar or restricted interpretation should be given to the terms employed, to the prejudice of creditors otherwise unsecured.   On the contrary, the language should be deemed as having been used in its natural and ordinary sense, and if there should be a doubt of the intent and meaning of the order which but embodies the express or implied agreement of the parties in interest, after the application of the well understood rules of interpretation, the doubt should rather lead to a liberal interpretation than to an interpretation which would exclude claims within the equities of the provision.   Such certainly should be th٨ effect and interpretation of the order, in view of the state ment of Mr. Clarkson N. Potter, the counsel of the plain tiffs and other bondholders and creditors, under whose advice and by whose instrumentality the order was obtained, that the word "employes" was used in these negotiations not in any particular or strict sense, but according to its ordinary and general meaning and as including attorney's compensation as well as that of other persons employed by the corporation."   I refer to this not as evidence in the proceeding controlling the interpretation, but as the statement of learned and ingenuous counsel conducting the proceeding and in perfect harmony with the mind of the court as expressed in the order made.   The cases which have been referred to involving the construction of statutes providing a better security for the payment of "laborers, clerks, servants," etc., of corporations for their services furnish but little aid in the interpretation of the order before us, made for a particular case and under peculiar circumstances and in terms essentially different from any statute which has come under my observation.   These statutes have been interpreted by the courts, and effect given to them restricted or liberal in view of the supposed policy and general legislative intent indicated by the particular terms employed.   Here no general or public

policy or legislative intent is involved. While in form it is the act and judgment of a court that is to be interpreted, it is in reality the intent of individual creditors of different classes contracting with each other as indicated by the terms of the order — the result of their negotiations and concessions — that is to be ascertained and declared.

All "laborers" and all "employes" of the railway corporation who have "actually done service in connection with that company's railways," are embraced in the terms used. None are excluded in terms or by implication, and all who come within the description are entitled to the benefit of the order. In the absence of any intent apparent on the face of the order to discriminate between different classes of "employes" or different kinds "of service," the court cannot confine it to a single class or to a particular service. The term "employe" is the correlative of "employer," and neither term has either technically or in general use a restricted meaning by which any particular employment or service is indicated. The terms are as applicable to attorney and client, physician and patient, as to master and servant, a farmer and day laborer or a master mechanic and his workman. To employ is to engage or use another as an agent or substitute in transacting business, or the performance of some service; it may be skilled labor or the service of the scientist or professional man as well as servile or unskilled manual labor. That the claimant was the "employe" of the corporation, and "done service" under his employment, cannot be questioned upon the evidence and under the finding of the referee. Was such service "in connection with the company's railways?" To restrict this term as used in the order to labor performed in and upon the railways proper of the corporation, and to exclude all services incidentally connected with or relating to the business affairs of the company growing out of and having respect to the possession and operation of the railways, would be quite too literal an interpretation, and defeat the evident design of the court and the framers of the order. The words, "in connection with that company's

railways," as used and in the relation they bear to the whole clause, are the equivalent of "in the interest and upon the employment of that company in and about its railways and the operation and management thereof, and all matters connected with, relating to, and growing out of the proper and legitimate business of the company as the possessor and operator of such railways." The phrase was intended to and does embrace every employment for the performance of any service in promoting the interest or enforcing and defending the rights of the company as a railway corporation in respect to the railways in its possession and under its management, which the corporation could perform by its board of directors, or by any competent agents. The services of the claimant were directly connected with and had respect to the railways of the company and its possession and right to control and operate the same, and in the most literal sense were directly within the terms employed; but in a more enlarged and liberal sense, as promotive of the business interests of the company in respect to and in connection with its railways, they were within the spirit and intent of the clause.

I concur in the views of Chief Judge CHURCH and his conclusions in respect to the clause under consideration.

CHURCH, Ch. J., ALLEN, RAPALLO and FOLGER, JJ., concur for reversal of orders of General and Special Term, and for affirmance of referee's report as to claim of Naylor & Co., unless said firm desire a rehearing as to amount of damages for defective frogs. In which case they to give notice within thirty days after service of notice of this judgment. Also that claim of J. S. Black be paid.

ANDREWS and JOHNSON, JJ., concur in all save allowance of claim of J. S. Black.

For affirmance, GROVER, J.

Ordered accordingly.