HENRY L. PIERSON AND OTHERS, APPELLANTS and RESPOND-
ENTS, v. ROBERT CROOKS, AND OTHERS, APPELLANTS AND
RESPONDENTS.

*Contract for a sale of iron — right of the purchaser to reject such as is not of the
quality specified — when the examination is not required to be made at the place of
shipment — when the purchaser may accept part and reject the remainder of the
iron delivered — when he may reject iron not loaded on the vessel at the port specified
in the contract.*

This action was brought by the plaintiffs to recover back moneys paid by them
for freight, duties and other charges on iron which the defendants, merchants
in the city of Liverpool, had by a written agreement, signed by their brokers in the
city of New York, agreed to sell and deliver to the plaintiffs.   The agreement,
which was dated in New York, stated that the defendants had sold to the
plaintiffs 100 tons W. I. W., or equal hoop iron, at £10 per ton; 100 tons
W. I. W., or equal sheet iron, at £11.15.0; fifty tons R. G., or equal sheet iron,
at £16.5.0, "all free on board Liverpool, payment by 60d St. Bl. Exchange,
against shipping documents here, less two and one-half per cent." It was
understood that the defendants, who were not manufacturers of iron, should
obtain it from other persons and ship it to the plaintiffs.   The plaintiffs
accepted all the iron agreed to be sold except the hoop iron and the final
shipment of the R. G. sheet iron, which they refused to accept, upon the
ground that the iron was very much inferior in quality to that which they
were, by the terms of the agreement, entitled to receive.   After the hoop iron
upon one vessel had been unloaded and weighed by the officers of the custom
house, and removed to the plaintiffs' place of business, it was rejected by
them, of which notice was given to the defendants.

*Held,* that the plaintiffs were justified in rejecting it at that time, and were
entitled to recover from the defendants what they had paid for freight, duties
and other charges or advances upon the iron.

That a claim made by the defendants that the right to examine and reject, or
accept, must be exercised before the iron was received and shipped at the city
of Liverpool, and could not be exercised after its arrival in the city of New
York, was not well founded.

*Allard* v. *Greasert* (61 N. Y., 1); *Mee* v. *McNider* (39 Hun, 345), and *Pope* v. *Allis*
(15 U. S., 363) followed; *Neaffie* v. *Hart* (4 Lans., 4); *Pease* v. *Copp* (67 Barb.,
132); *Stafford* v. *Pooler* (Id., 143) distinguished.

After the arrival in the city of New York of one of the vessels upon which the
hoop iron was loaded, and before the other vessel had left the city of
Liverpool, and before it had been loaded with all the iron to be shipped upon
it, the plaintiffs notified the defendants that they would not receive any more
iron of the quality shipped on the first vessel.

*Held,* that as it was shown that the iron loaded on the second vessel was of the

same quality as that loaded on the first, the plaintiffs were entitled to reject it without inspecting or examining it.

*Pope* v. *Porter* (102 N. Y. 366) followed.

Some of the hoop iron was shipped upon vessels upon which were also shipped portions of the sheet iron. The sheet iron was accepted and received by the plaintiffs, while the hoop iron was rejected.

*Held,* that the contract being for the sale of different qualities of iron at different prices it was not to be considered as an entire contract, but as a severable one, and that the plaintiffs were entitled to receive that distinct part of the property which complied with the terms of the agreement, and to reject that portion thereof which failed to comply therewith.

*Young* v. *Wakefield* (121 Mass., 91); *Merrill* v. *Agricultural Insurance Company* (73 N. Y., 452); *Swift* v. *Opdyke* (43 Barb., 274) followed.

That payments made by the plaintiffs towards the purchase-price of the iron did not operate as a waiver of their right to object to the quality of the iron, as such payments were made, as required by the agreement, upon the production of the shipping documents, and upon the supposition that the contract had been, or would be, so performed as to entitle the defendants to the money.

A portion of the R. G. sheet iron was not laden on the vessel by which it was shipped at Liverpool, but was laden at Cardiff, a port in Wales on the British channel.

*Held,* that the plaintiffs were entitled to refuse to accept it as the defendants had, by the agreement, agreed to ship the iron at Liverpool.

*Filley* v. *Pope* (115 U. S., 213) followed.

That the performance of this condition of the agreement was not waived by the plaintiffs, by receiving and paying for other iron so shipped, as the payment was made without information on the part of the plaintiffs that such other iron had not been shipped at Liverpool.

APPEAL from a judgment entered on the report of a referee.

*George A. Black* and *James C. Carter*, for the plaintiffs.

*John L. Hill*, for the defendants.

DANIELS, J.:

The action was brought by the plaintiffs to recover back moneys paid by them for freight, duties and other charges, on iron which the defendants contracted to sell and deliver to them. The contract was made through the agency of brokers representing the defendants, who were merchants in the city of Liverpool. The contract is as follows:

"NEW YORK, *February* 11, 1880.

"Sold to Messrs. Pierson & Co., New York, for account of Messrs. Robert Crooks & Co, Liverpool:

" One hundred (100) tons W. I. W., or equal hoop iron, at £10 per ton.

" One hundred (100) tons W. I. W., or equal sheet iron, at £11,15,0.

" Fifty (50) tons R. G., or equal sheet iron, at £16,5,0, all free on board Liverpool, payment by 60d st. Bl. exchange against shipping documents here, less two and one-half per cent. Immediate specification.

" WHITE & DRUMMOND,

"*Brokers.*

" Accepted.

" PIERSON & Co."

And the 100 tons of hoop iron mentioned in it were afterwards increased to 150 tons. Specifications were supplied by the plaintiffs for the shipments and delivery of the iron in three or four different parcels. The defendants were not manufacturers of the iron, but it was designed that they should, as they afterwards did, obtain that from the manufacturers which they afterwards shipped to the plaintiffs. The 100 tons of sheet iron proved to be satisfactory and acceptable and was received and paid for by the plaintiffs. And so was a certain portion of what is called the R. G. sheet-iron, subject to certain allowances and deductions which were made. The controversy in the action has, in this manner, been limited to the hoop iron and the final shipment of the R. G. sheet iron amounting to nearly forty-one tons. As to all the hoop iron, and this residue of the R. G. sheet iron, the plaintiffs objected to receiving it upon its arrival in New York where the hoop iron was unladen, and in Brooklyn where the R. G. sheet iron was unladen. The objection taken to the acceptance of the hoop iron was that it was very much inferior in quality to that which the plaintiffs were, by the terms of the agreement, entitled to receive. Two of the shipments which were made of the hoop iron were also accompanied with shipments of sheet iron. These were made upon the steamers Germanic and Arizona. Other shipments of hoop iron were made by the steamers City of Chester and Abyssinia. Upon these two steamers were laden no portion of either quality of sheet iron, and upon the arrival of the City of Chester and the unlading of the iron, the

plaintiffs, upon an examination of its quality and condition, rejected it as not in compliance with the agreement they had made with the defendants. And the referee, by his decision, concluded that the plaintiffs were justified in the objections made to this iron, and also that laden on the Abyssinia, leading them to reject it. And for that reason they have been permitted by the judgment to recover against the defendants what they paid for freight duties and other charges, or advances, upon this iron. It appeared, by the evidence, that they were not permitted to handle or remove the iron until it had been weighed by the officers of the custom house, and that after delaying until that was done the portion of the iron coming by the Germanic was taken to the plaintiff's place of business where an examination was made of it resulting in their determination to reject it, of which notice was given to the defendants. The other was examined upon the wharf, and, being found of the same quality, that also was rejected. That the evidence justified the referee in concluding this iron to be of an inferior quality to that mentioned in the contract of sale, is conceded by the case, and that relieves it from the necessity of any examination of this fact which was disputed before the referee upon the trial.

There appears to be nothing unreasonable in the delay which took place at the city of New York in the examination of the iron after its arrival. It was not done as speedily as that might be done, but, as the circumstances were made to appear, there was no unreasonable delay on the part of the plaintiffs in subjecting the iron to these examinations. And as the law has required no more than reasonable diligence in the examination of property shipped, or offered, to the purchaser after its arrival, its requirement was observed by the plaintiffs in this instance. They were not required to dispense with the other demands of their business and devote immediate attention to this iron, but it was their duty to proceed reasonably as they would be expected to do with other urgent matters of business. And that duty does not seem to have been neglected as the facts of this case have been disclosed.

It is insisted, however, on behalf of the defendants, that this right to examine the iron and reject, or accept it, as it was found not to conform with the contract, could not be made after it was received and shipped at the city of Liverpool; that the agreement designated

that to be the place for its delivery, and imposed the duty upon the plaintiffs of making their examination of it at that port. But that is not the construction which should be given to the agreement. It neither provided for nor contemplated an inspection, or examination of the iron at that port, but what was to be there done was for the defendants to deliver the quality of iron mentioned and described in the agreement free on board at that place. This was the obligation they undertook by the contract that was entered into. It was to deliver on board the ships at Liverpool this and no other quality of iron. And no intimation was given, or expectation indicated that the plaintiffs, who were merchants, doing business in the city of New York, should present themselves at Liverpool, either personally or by an agent, to discover whether the defendants performed this obligation or not. No intervention on their part was provided for, but the part of the contract to be there performed was wholly cast upon the defendants themselves, and if they failed to perform it the plaintiffs had the right, upon the discovery of that fact, to reject so much of the iron as failed to comply with the terms of the contract. A point similar to this was considered in *Allard* v. *Greasert* (61 N. Y. 1), where the controversy arose under the statute of frauds. And while this statute is not brought in question in this case, what was there said concerning the obligation of the vendee to examine the property at the place of shipment for the purpose of ascertaining whether it complied with the requirements of the contract is applicable to this controversy. But if not, because of this distinguishable circumstance, still, as it was manifestly the intention of the parties from the agreement that what was to be done at Liverpool was to consist wholly of the acts of the defendants, the vendees were not obliged to present themselves there either in person, or by agent, to see whether they performed, as they agreed to do, that, or not. This point, under a somewhat similar contract, was considered in *Mee* v. *McNider* (39 Hun, 345), where it was held that the contract of sale obligated the vendor to deliver the property agreed to be sold in the condition required by the agreement, on shipboard at the place of shipment. And if he did that, his agreement was performed, and he thereby placed the property at the risk of the vendee, while if he failed to do so he failed to perform his contract. This point was also considered, and a like conclusion reached in

*Pope* v. *Allis* (115 U. S., 363). And the authorities very clearly distinguish this case from those relied upon in support of this position by the defendants. For in *Neaffie* v. *Hart* (4 Lansing, 4), the defective boiler was not only received, but knowing its defects, it was retained and used as a boiler by the vendee. And so was the cheese which was the property sold in *Pease* v. *Copp* (67 Barb., 132). While in *Stafford* v. *Pooler* (Id., 143), the contract made the delivery of the hoops personal to the defendant. These cases are, consequently, inapplicable to the controversy and do not conflict in the principle they follow with that maintained by the other authorities. Those authorities proceed upon the obligation of the vendor in an agreement of this character to ship the property of the quality and in the condition described in the agreement, reserving, upon its arrival at the port of destination, to the vendee the right to examine and reject it if that obligation appears not to have been performed.

This right of inspection and examination preceding the obligation to accept the property is maintained by all the authorities where the sale is executory, and the property itself is unascertained or separated, as were the facts in this case. This was the conclusion of the court in *Sprague* v. *Blake* (20 Wend., 61), where it was said that "when the party comes under such a contract, to deliver an inferior unmerchantable commodity, which lies open to inspection, then is the time for the vendee to take his ground. He must then refuse acceptance, or at least so soon as he discovers what the quality of the article is, and offer to return it." (Id., 64.) And as much as this was held in *Reed* v. *Randall* (29 N. Y., 358), for there it was stated in the prevailing opinion that the vendee "is not bound to receive and pay for a thing that he has not agreed to purchase; but if the thing purchased is found, on examination, to be unsound, or not to answer the order given for it, he must immediately return it to the vendor, or give him notice to take it back and thereby rescind the contract, or he will be presumed to have acquiesced in its quality. He cannot accept the delivery of the property under the contract, retain it after an opportunity of ascertaining its quality, and recover damages if it be not of the quality or description called for by such contract." (Id., 363.) And *Gurney* v. *Atlantic, etc., Railway Company* (58 N. Y., 358) proceeds upon the same principle. There

it was stated that "the general rule is when articles are sold upon an executory contract  *  *  *  that the delivery and acceptance of the articles, after examination, or an opportunity to examine them, is a consent or agreement that the articles correspond with the contract and precludes a recovery for any defects which may exist." (Id., 364.)  And the plaintiffs fully complied with this rule in their examination of the iron, their refusal to receive it, and their notice of that refusal to the defendants.  This examination was made when the opportunity first presented itself for observing and testing the make and quality of the iron.  It was not required that this should be done before the arrival of the iron at its port of destination by anything contained in, or to be implied from, the agreement, and the right to subject it to the examination which was made was, under the authorities referred to, for the first time legally presented upon the arrival of the iron in the city of New York.

In the case of *Pope* v. *Allis* the examination and inspection of the property was deferred to a much longer and more remote point of time, and still it was sustained by the court and the vendee was relieved from the obligation to receive and accept the property under the agreement.  As to these two shipments, by the City of Chester and Abyssinia, therefore, the plaintiffs clearly maintained their right to recover the amounts awarded to them by the referee in his report, for, while the iron on the Abyssinia was not actually inspected or examined by the defendants, the evidence in the case justifies the conclusion that it was of the same quality as that delivered from the City of Chester.  It was not contended to be otherwise by the defendants, and the plaintiffs, assuming from the three preceding shipments that the hoop iron was all of the same quality, notified the defendants of their refusal to receive any more of that quality of iron; and this was communicated to the defendants before the iron by the Abyssinia was entirely laden or the ship had left the city of Liverpool.  In this refusal they certainly seem to have been justified by the principle proceeded upon in *Pope* v. *Porter* (102 N. Y., 366), for, as the defendants had shipped to them only this inferior quality of iron, the facts supported them in the conclusion that no better quality could be expected to be received under the agreement.

As to the hoops shipped by the steamers Germanic and Arizona,

a further objection to the right of the plaintiffs to recover arises out of the fact that upon these steamers there were also shipped certain qualities of the sheet iron, the Germanic having on board upwards of fifteen tons, and the Arizona upwards of forty-seven tons of the sheet iron. This iron was accepted and received by the plaintiffs, but the hoop iron arriving with it was rejected, and the objection has been taken that the plaintiffs could not accept one portion of these shipments and reject the other. But by the agreement these were two distinct and separate qualities of iron which the defendants agreed to sell, and deliver for different prices. For the hoop iron they were to be paid ten pounds per ton, and for the sheet iron they were to be paid eleven pounds, fifteen shillings per ton. These sales were accordingly of two separate and distinct subjects, for distinct prices pertaining and applicable to each of them. And when that is the case the contract of sale has not been considered to be entire but severable in its nature, allowing the purchaser to receive that distinct part of the property complying with the terms of the agreement, and to reject the other distinct part which fails to be of the description of the property agreed to be sold. This point was considered in *Young, etc.* v. *Wakefield* (121 Mass., 91), where it was held that different articles, bought at the same time, for distinct prices, might be accepted so far as they conformed to the agreement of sale, and rejected where that proved not to be the fact. (Id. 93.) This was also held to be the law in *Merrill* v. *Agricultural Insurance Company* (73 N. Y., 452), and the same principal is applied in *Swift* v. *Opdyke* (43 Barb., 274), and it is in no degree inconsistent with the case of *Secor* v. *Sturges* (16 N. Y., 548).

This principle, applied in this manner, is entirely in accordance with the general legal rule that where an agreement is to be rescinded it must be rescinded wholly, or not at all, for the plaintiffs did not undertake to rescind the agreement relating to the shipments of hoop iron, except in the single instance of that which finally came by the Abyssinia. What they did was to refuse to receive the inferior quality of hoop iron shipped to them by the defendants for the purpose of performing their agreement. That did not rescind the contract or any part of it. It was still left, as a subsisting agreement between these parties, which the defendants might have fulfilled by supplying the plaintiffs with the proper quality of

hoop iron.   If they had done that then the plaintiffs would have been liable for whatever damages might have been sustained by refusing to receive the iron.   And as they failed to do that the plaintiffs were at liberty to claim indemnity under the contract for what they had paid upon the iron, or for any loss they might have sustained in consequence of a favorable change in its market price. These rights legally grew out of the contract itself and entirely distinguish the case from those where a rescission of an agreement has been attempted.   There the law requires that it shall be wholly rescinded to make the act of the party effectual for the purpose of recovering back that which he may have parted with under the agreement.   This is not that case, but it is a case where the defendants agreed to deliver a special quality of hoop iron and failed to do so.   By that failure they omitted to perform their agreement, and all that the plaintiffs did was to refuse to receive the inferior iron when they discovered this failure on the part of the defendants.   It was not a rescission of the agreement in any respect whatever, but no more than a refusal to receive what they were not bound to accept as a part performance of it.   And they were accordingly entitled to recover upon the view which the referee was supported in adopting concerning the facts of this part of the controversy.

The payments which were made by the plaintiffs towards the purchase-price of the iron did not have the effect of waiving their right to insist upon it that the quality should be the same as that mentioned in the agreement, for the first payment does not seem to have included any part of the hoop iron on the Germanic, which had then been discovered to be defective in quality, and it was made, as the agreement declared it should be, by a bill of exchange against the shipping documents produced and delivered to the plaintiffs, which it was essential they should possess in order to be able to obtain any control of the iron.   This payment, including the invoice by the Arizona, as well as the succeeding payment, were made on account, and on the supposition that the contract had been, or would be, so performed as to entitle the defendants to the money.   It was not a voluntary payment, in the sense excluding their right to recover so much of it back, as would protect the defendants against the obligation to restore so much of the money,

as the plaintiffs' indemnity required to be restored, by the failure to perform the agreement which they entered into. Neither these payments nor any other facts appearing in the case deprive the plaintiffs of their right to recover, so far as it has been sustained by the conclusions of the referee.

It has, however, by the judgment been determined that the plaintiffs were not justified in refusing to accept so much of the R. G. sheet iron as arrived by the steamer Rhubina. This iron was not laden on the steamer at Liverpool, but it was put on board of her at Cardiff, a port in Wales, on the Bristol channel. And because of its shipment in this manner, as well as objections taken to a slight excess in quantity, the plaintiffs refused to receive it. And the first of these objections certainly appears to have been warranted by the agreement, for the defendants agreed to ship the iron at Liverpool. They were not to insure it, but that was to be done, according to the specifications, by the plaintiffs, and, as they were not aware of this change in this port of shipment, the insurance effected by them upon it, if they did insure it, would have been worthless, if the iron had been injured or lost by a peril of the sea. This variation from the port of shipment would render the insurance invalid, and it did not create even a qualified delivery of the iron to the defendants, subject to their right of examination, under the rule sustained in *Wilcox Silver Plate Company* v. *Green* (72 N. Y., 17). For, to constitute even a qualified delivery of this description, the defendants were bound to ship the property as that had been provided for in their agreement, and having failed to do that, and no acceptance of the iron being made by the plaintiffs after its arrival, there was not even a qualified delivery of the iron shipped in this manner.

As to this iron the defendants failed to perform what the parties had agreed upon as one of the precedent attributes of their contract. And the performance of that condition was not waived by receiving and paying for the iron shipped at the same port on the Rhiwinda, as that payment was made without information on the part of the plaintiffs that the iron had not been shipped at Liverpool, and the defendants accordingly had no legal right to claim that this iron should be received by the plaintiffs. A point of this description was considered in *Filley* v. *Pope* (115 U. S.,

213), where it was held that such a departure in the port of ship-
ment relieved the vendee from accepting or receiving the property
so shipped. The referee accordingly erred in the conclusion arrived
at by him, that the plaintiffs were legally liable to accept this iron,
and not having done so, were chargeable with the difference between
the price they agreed to pay for it and the net proceeds of the sale
which was afterwards made of it. This part of the judgment,
therefore, requires to be reversed, and the amount deducted on
account of it from the demands sustained by the proof in the
plaintiffs' favor should be restored. And as there is not the slight-
est ground for supposing or suggesting that the defendants will be
able to make any case upon which the plaintiffs would be legally
chargeable for this difference, a further trial of this part of the
action will not be necessary.

This part of the judgment should, accordingly, be reversed, and
the counter-claim of the defendants, including it, dismissed, unless
a further trial of this part of the action shall be made to appear to
be desirable on the settlement of the terms of the decision, and the
plaintiffs should have judgment for the amount found to be other-
wise due and owing to them by the referee and included in the
judgment, and as so modified the judgment should be affirmed.

DAVIS, P. J., and BRADY, J., concurred.

Judgment modified as directed in opinion, and as modified
affirmed.