## JAMES v. LIBBY, McNEIL & LIBBY.

### (Supreme Court, Appellate Term.   June 13, 1904.)

1. SALES—INSPECTION—ACCEPTANCE—BREACH OF WARRANTY—ESTOPPEL.

   Acceptance, after inspection by the buyer, of sausages delivered under contract of sale, warranting that they should be dry enough for export, estops him from relying on a breach of the warranty, where the acceptance was not accompanied by a renewal of the warranty manifesting an intention to have it survive acceptance.

2. SAME—CONTRACT OF INDEMNITY.

   A contract for the sale of sausages provided that they should be microscopically inspected, and dry enough for export.   On delivery, the buyer opened some of the boxes and inspected their contents, and expressed to the seller his doubts whether they were sufficiently dry or free from fat to be accepted by his customer, who was a resident of a foreign country, and asked for a reduction in price on that account, which the seller refused to concede, but agreed in writing that if any claim should be made for too much fat he would make the same good.   *Held*, that the writing was not a warranty, but a contract of indemnity.

3. SAME—CONSIDERATION.

   Where the buyer and seller of sausages under a written contract, on tendering delivery thereof, differed as to the quality of the sausages, and especially as to whether they were too fat to satisfy a particular customer, and thereupon the seller wrote out and handed to the buyer a contract of indemnity for any claim that should be made for too much fat by the customer, there was a sufficient consideration for the contract, in that the buyer waived his objections and accepted the goods.

4. SAME—ACTION FOR BREACH—FAILURE OF PROOF.

   Where a buyer and seller of sausages under written contract, on tendering delivery thereof, differed as to the quality of the sausages, especially as to whether they were too fat to satisfy a particular customer of the buyer in a foreign country, and thereupon the seller wrote out and handed to the buyer a memorandum contract, agreeing to make good any claim that should be made for too much fat, intending thereby to make good any claim by that particular customer, and the goods were shipped to the customer, but never reached him on account of some unexplained action of the governmental authorities of the country of which he was a resident in refusing to permit the sausages to be received, and they were returned to the buyer, it is immaterial, in an action against the seller to recover on the memorandum contract, whether it was one of indemnity or an extension of the original warranty, since the event against which defendant undertook to indemnify the plaintiff never happened.

Appeal from City Court of New York, Trial Term.

Action by William James against Libby, McNeil & Libby.   From a judgment for plaintiff and an order denying a motion for new trial, defendants appeal.   Reversed.

Argued before FREEDMAN, P. J., and TRUAX and SCOTT, JJ.

J. Brownson Ker, for appellants.

Dittenhoefer, Gerber & James, for respondent.

SCOTT, J.   Plaintiff's assignor, one Willard, on February 20, 1899, purchased from defendants a quantity of unsmoked Farmers' sausages, to be manufactured and delivered on future dates.   The contract, which was in writing, provided that the goods should be "all microscopically inspected and dry enough for export," and it appears from the evidence

that the dryness of a sausage is mainly determined by the amount of fat it contains.

In April defendants shipped 100 boxes of sausages to Willard, which arrived in New York on April 22d. Willard, with the assistance of a clerk, examined the sausages by opening some of the boxes and cutting open some of the sausages. So far as appears, he had ample opportunity to make, and did make, as thorough an examination as he deemed necessary, and there is nothing from which it can be inferred that the sausages he actually examined were not a fair sample of the whole consignment. Willard had purchased the sausages for shipment to a customer in France, and after he had examined the goods he expressed doubts whether they were sufficiently dry, or free from fat, to be accepted by his customer. Defendants were represented by one Davenport, who had negotiated the sale and was present when the goods were examined, and who insisted that they were not too fat, but were of the quality specified in the memorandum of sale. Willard asked for a reduction in price, which Davenport refused to concede. Finally Davenport agreed, in writing, on behalf of defendants, if any claim should be made "for too much fat in 100 boxes Farmers [sausages], to make the same good." It is quite evident, from the discussion leading up to the making of this agreement, that what both parties understood was that defendants were to make good to Willard if his customer in France should make a claim against him for excessive fat in the sausages. Upon the receipt of this agreement, and undoubtedly in reliance upon it, Willard waived his objection to the quality of the sausages, and accepted and paid for them. They were shipped to France, but never reached Willard's customer, because the French authorities refused to permit them to be landed; consequently, of course, no claim for excessive fatness was ever made upon Willard by his customer. What particular defect the French authorities found in them does not appear. The sausages were reshipped to New York, and in July were sold for much less than the price paid defendants by Willard. On their arrival here they were examined by an expert employed by Willard, who testified that he found signs of deterioration in the sausages, indicating that they had been at the time of original packing not sufficiently dried; but, although the question was twice put to him point-blank, he declined to say that they had been too fat for export, only saying that they "evidently contained an abundance of fat, a trifle more than is usually put in a dry sausage." This was the only witness called by plaintiff to establish the fact of the inferior quality of the sausages. The defendant produced two witnesses, who testified that the sausages, when delivered to Willard, were in perfect condition, and conformed, as to quality, with the terms of the contract of sale.

It is urged, in support of the judgment, that defendants' undertaking in the memorandum of sale, that the sausages should be dry enough for export, was a warranty, and that, inasmuch as the general rule is that a warranty survives acceptance, Willard might, notwithstanding his acceptance of and payment for the goods, afterwards sue defendants for breach of the warranty. There is no magic in mere words, and the relative rights of the parties will not be altered whether

we call the agreement as to the quality of the goods to be delivered by the name of "warranty" or by some other name. Nor is it safe to assume, even if the undertaking as to the quality of the goods be properly called a "warranty," that the general rule that a warranty survives acceptance applies to every undertaking or agreement which is properly and commonly designated as a "warranty." The cases dealing with the rights and obligations flowing from warranties are innumerable, and if mere extracts from opinions be read, without careful regard to the facts dealt with, it may be found difficult to reconcile all of the decisions. There is, however, an underlying principle upon which rest both the rule that warranty survives acceptance and the apparent exceptions to the rule. That principle is that if it appears from the nature of the warranty, and the character of the property warranted, and the relations of the parties to each other and to the subject of the warranty, that it was intended that the vendee should rely upon the warranty, in accepting the goods, as an assurance that he is accepting what he contracted to buy, the warranty will survive acceptance, but if the warranty be that the goods are of a certain kind or quality, and a mere inspection will show whether or not they are of such kind or quality, and the vendee has full opportunity to inspect them, and does in fact inspect them, before acceptance, the reason for the survival of the warranty ceases, and it will not survive acceptance.

In Brigg v. Hilton, 99 N. Y. 517, 3 N. E. 51, 52 Am. Rep. 63, there are expressions in the opinion which, taken alone, lend color to the contention that a warranty of quality always survives acceptance, even when full opportunity to inspect the goods precedes the acceptance. An examination of the facts shows, however, that it is authority for no such proposition. The goods sold were cloakings which had been sold by sample. The goods delivered were inferior to the samples, and if inspected before acceptance their inferiority would have been apparent. The warranty was not, however, a part of the contract of sale, but a collateral agreement, and before defendants received the goods the plaintiff had exhibited other samples, represented to be samples which came with the goods from the manufacturers, and which were equal in quality to the original samples. It is easy to see that it might well have been, and probably was, the intention of the parties that the defendants should accept the goods without inspection, in reliance upon the collateral warranty, and upon the exhibited samples shown as accurately representing the delivered goods.

In Parks v. Morris Ax & Tool Co., 54 N. Y. 586, cited and relied upon in Brigg v. Hilton, the subject of the sale was cast steel to be manufactured into axes, and the warranty was that it should "be equal in quality to Jessup's or other standard brands." Whether or not the steel would have been equal to the warranty could be determined only after the axes had been manufactured from it, and stress is laid upon the fact in the opinion, wherein it is said:

"Obviously, mere inspection could not determine whether the steel delivered was the best ax steel, and equal in quality to any English brand. In order, therefore, to any substantial protection of its rights, the defendant was compelled to rely upon the warranty."

In Fairbank Canning Company v. Metzger, 118 N. Y. 260, 23 N. E. 372, 16 Am. St. Rep. 753, the warranty was collateral to the contract of sale, and was to the effect that plaintiff would deliver to defendant beef from cattle that had not been heated before being slaughtered. As was observed by the court, the warranty was of such a character "that defendants were obliged to rely solely upon the representation of the plaintiff in respect thereto. The plaintiff or its agents selected from their stock the cattle to be slaughtered. No one else knew or could know whether they were heated or feverish. Inspection immediately after placing the beef in the car would not determine it"—and for that reason it was held that the warranty necessarily survived the acceptance.

In Hooper v. Story, 155 N. Y. 171, 49 N. E. 773, the subject of sale was a varnishing machine, and the warranty was that it would turn out a certain quantity of work per day. Obviously, its capacity to turn out work could not be determined until it was tested, and it could not be tested until it had been accepted, and therefore, to make the warranty effective, it must survive acceptance.

There are to be found many authorities in this state for the proposition that, in the absence of fraud or latent defects, an acceptance of the article sold upon an executory contract, after an opportunity to examine it, is a consent and agreement that the quality is satisfactory and conformable to the contract, and bars all claim for compensation for any defects that may exist in the article. It was so held in Gaylord Mfg. Co. v. Allen, 53 N. Y. 515, wherein it was also held that it made no difference whether the warranty was express or implied. In Gurney v. Atlantic & G. W. Ry. Co., 58 N. Y. 358, the court recognized and declared the general rule that, when articles are sold upon an executory contract, the delivery and acceptance of the articles, after examination or an opportunity to examine them, is a consent and agreement that the articles correspond with the contract, and preclude a recovery for any defects which may exist; at the same time recognizing and applying the other equally well-settled rule that the vendee must have an opportunity to examine, and when, from the terms of the contract or the nature of the article, this can only be done by use, and such was therefore the mode of examination contemplated, the vendee is not foreclosed until the test is made. In Studer v. Bleistein, 115 N. Y. 316, 22 N. E. 243, 5 L. R. A. 702, the authorities dealing with the rule now under discussion are exhaustively examined and reviewed, and the rule is restated as follows:

"An acceptance by the vendee of personal property manufactured under an executory contract of sale, after a full and fair opportunity of inspection, in the absence of fraud, estops him from thereafter raising an objection as to visible defects and imperfections, whether discovered or not, unless such delivery and acceptance is accompanied by some warranty of quality manifestly intended to survive acceptance."

To the same effect is Coplay Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335.

The case now before us falls within the letter and reason of the rule established by the authorities last cited. The contract of sale

was executory; the undertaking or warranty of quality, that the sausages should be "dry enough for export," was one of the terms of the contract itself; the defect, if any existed, was patent and discoverable upon inspection; Willard, plaintiff's assignor, had full opportunity to examine them, and after such examination accepted them. It is clear that he did not rely upon the warranty in accepting. He may have relied upon his own judgment. He certainly relied upon the new agreement made by Davenport on behalf of defendants, but he did not rely upon the original warranty. His acceptance of and payment for the goods after examination, under the authorities above cited, estopped him from afterwards suing upon the warranty.

The second paper upon which plaintiff bases his right to a recovery is not, properly speaking, a warranty at all, but a contract of indemnity, which rests upon sufficient consideration. The plaintiff's assignor and defendants' agent differed as to the quality of the sausages, and especially as to whether the customer in France would accept them. Willard's waiver of his objection and acceptance of the goods furnished a sufficient consideration for the contract. Whether the agreement made by Davenport to induce plaintiff to accept the sausages be regarded as a contract of indemnity, or as an extension, to the extent indicated by it, of the original warranty, is not material, because the event against which defendants undertook to indemnify Willard never happened. That event was, "if claim is made for too much fat," defendants would make good—meaning, evidently, if a claim was made by Willard's customer in France. No such claim was ever made, because the goods never reached the customer. Why their entry into France was forbidden does not appear. It may have been for excessive fat, or for some other defect not covered by the warranty. At all events, the contingency against which defendants undertook to indemnify Willard did not arise. The plaintiff, therefore, showed no right under the agreement of April 22, 1899.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event. All concur.